KOHLER ET AL., APPELLEES, *v.* SNOW VILLAGE, INC., APPELLANT.

(No. 47374—Decided April 30, 1984.)

*Mr. David B. Gallup,* for appellees.
*Mr. Michael I. Greenwald,* for appellant.

CORRIGAN, P.J. On December 6, 1973, James and Jacqueline Kohler, the appellees herein, purchased one share of stock in Snow Village, Inc., a cooperative apartment corporation, appellant in this case. Upon the purchase of the stock, the appellees entered into a "Standard Occupancy Agreement" (occupancy agreement) with the appellant which entitled them to the exclusive use and occupancy of Unit 56 in the Snow Village complex.

The appellees lived in their unit for approximately six years without incurring any problems. In late 1979, however, Jacqueline Kohler began experiencing severe back pain. After being examined by her doctor, she was instructed to avoid climbing stairs. The appellees' unit was a two-story town house, with two flights of stairs between the first and second floors. Realizing that they had to move, the appellees purchased a new home and began making the necessary arrangements to leave their town house at Snow Village.

Rather than sell their interest in the cooperative, however, the appellees, after moving out and establishing a new residence in Grafton, Ohio, sought to sublet their unit to James Kohler's younger sister, Sallie. The appellees made several verbal inquiries of an officer of the appellant regarding how they could go about subletting their unit. After receiving no response, James Kohler hand delivered a written inquiry to Raymond Miller, president of the appellant corporation. Several days later the appellees received a letter, signed by the appellant's secretary, reflecting the corporation's policy and stating that no one, other than a shareholder, could occupy a suite in the cooperative complex.

Despite the fact that they did not receive consent to sublet their unit to Sallie Kohler, the appellees moved out in late 1979 and Sallie Kohler moved in in early 1980. James Kohler, who had served as president of the appellant corporation, admitted at trial that he was aware of the fact that no one could sublet a unit without the corporation's consent. Once she moved into the appellees' suite, Sallie Kohler was not expected to make any of the monthly maintenance or carrying charges on the unit, although the appellees hoped that she might be able to contribute. Thus, this arrangement was neither an assignment of the occupancy agreement nor a sublet of the suite. The appellees simply decided that they would move out of their unit, maintain their interest in the cooperative, and allow Sallie Kohler to live in the unit while they continued to make the monthly assessment payments. There was no formal agreement between the appellees and Sallie Kohler, Sallie Kohler and the appellant, or the appellant and the appellees.

Although the appellees moved their possessions out of their Snow Village unit, James Kohler did leave some of his clothes and some shaving implements there. However, it is apparent that the appellees spent almost no time at the Snow Village unit once they moved out.

The appellant never has granted Sallie Kohler permission to live in her brother's suite, and in fact, it has made several unsuccessful attempts to evict her. The matter finally went to trial on December 21, 1982. The appellees sought damages for what they considered to be the appellant's breach of contract by refusing to sublet to Sallie

Kohler and its refusal to make necessary repairs in the unit. Sallie Kohler filed a claim seeking damages due to alleged sex discrimination by the appellant. It was her contention that the problems she was experiencing with the appellant were due to the fact that she is female. The appellant counterclaimed for Sallie Kohler's eviction from Unit 56, arguing that she was living there in violation of the terms of the occupancy agreement.

On August 9, 1983, the trial court issued its findings of fact and conclusions of law. The court concluded that the agreement in this case is a "rental agreement" which falls within the scope of R.C. Chapter 5321. The court ruled that by prohibiting Sallie Kohler from living in her brother's suite, the agreement was unconscionable. It was thus held that Sallie Kohler could remain in her brother's suite at Snow Village, although the court only awarded the appellees $10 in nominal damages due to the appellant's alleged breach of contract. The court ruled against Sallie Kohler on her claim of sex discrimination, and it also ruled against the appellant on its counterclaim seeking Sallie Kohler's eviction.

The appellant is now before this court assigning the following errors:

"I. The lower court erred in declaring the standard occupancy agreement utilized by Snow Village, Inc. as a 'rental agreement' pursuant to Ohio Revised Code, Section 5321.01(D) and further, whether same is unconscionable pursuant to Ohio Revised Code, Section 5321.14(A), and by reason of same, erred in failing to order the plaintiff-appellee to vacate the subject premises by means of eviction proceedings.

"II. The lower court erred in determining the existence of a legal relationship between an owner of premises and an unlawful occupant, and by reason of same, erred in failing to order the plaintiff-appellee to vacate the subject premises by means of eviction proceedings.

"III. The lower court erred in imputing damages where none were found to exist."

I

The initial issue for the court's consideration is whether the occupancy agreement we have before us is a "rental agreement" as defined in R.C. 5321.01(D) and is unconscionable pursuant to R.C. 5321.14(A). We will address later the issue of whether the trial court erred in failing to order the eviction of Sallie Kohler from the appellees' town house at Snow Village.

In order to adequately address these issues, it is necessary to attempt to delineate the nature of a cooperative apartment corporation and the role of the cooperator-resident within that corporation.

"A cooperative apartment is a multi-unit dwelling in which, as a general rule, each resident has (1) an interest in the entity owning the building as evidenced by his stock subscription or share, and (2) a proprietary lease entitling him to occupy a particular apartment within the building." *Sanders* v. *The Tropicana* (1976), 31 N.C. App. 276, 280, 229 S.E.2d 304. See, also, *AMR Realty Co.* v. *State* (1977), 149 N.J. Super. 329, 373 A.2d 1002.

The cooperative is unlike any other property interest, although it shares characteristics with other types of property interests. As stated in *Matter of State Tax Comm.* v. *Shor* (1977), 43 N.Y. 2d 151, 400 N.Y. Supp. 2d 805, 371 N.E. 2d 523:

"The ownership of a tenant-shareholder in a co-operative apartment is *sui generis. [Id.* at 154.]
"* * *

"Shares in the corporation are sold to each apartment 'owner' who receives a stock certificate, not a deed to real property. The shares entitle the shareholder to a long-term apartment 'proprietary lease.' * * * One has, therefore, a mixed concept and ter-

minology, superficially resembling the traditional rental apartment lease, except for example, that the lessee pays monthly maintenance charges and is subject to assessments instead of rent. For some purposes it is a lease; for others it is a compact between co-operative corporation and co-operative tenant. In any case, the rights of the tenant are initiated by the capital investment made in the shares of the co-operative corporation." (*Id.* at 156.)

While the interest in a cooperative is something of a hybrid between renting and owning, it would not be incorrect to state that the similarity is closer to the latter than to the former.

"The cooperator's interest in the cooperative project is clearly more than that of the tenant in a landlord-tenant situation, but it may be slightly less than the fee simple ownership enjoyed by an individual homeowner or the owner of a condominium unit." Note, Real Property: Cooperative Housing Corporations—A Viable Real Estate Financing Device in Oklahoma (1982), 35 Okla. L. Rev. 167.[1]

The term "rental agreement" is defined in R.C. 5321.01(D) as follows:

" 'Rental agreement' means any agreement or lease, written or oral, which establishes or modifies the terms, conditions, rules, regulations, or any of the provisions concerning the use and occupancy of residential premises by one of the parties."

The key term in this definition is "parties." The problem with applying the above definition to the occupancy agreement in this case, and to all proprietary leases in cooperative apartments, is that R.C. Chapter 5321, the Landlord-Tenant Act, was enacted to specifically outline the rights possessed by landlords and tenants under standard, traditional rental agreements. The

"parties" in cooperative apartments are not easily defined and addressed in terms normally applied to landlords and tenants under standard rental agreements. An examination of R.C. Chapter 5321 reveals its scope does not comfortably encompass the unique characteristics of the cooperative apartment.

A cooperator-resident shares some of the characteristics of a "tenant" as defined in R.C. 5321.01(A). However, in actual terms, the cooperator could also be considered a type of landlord. A cooperator lives in his or her apartment by virtue of the proprietary lease. That lease is received only *after* the purchase of the requisite number of shares of stock in the cooperative corporation. The cooperator-shareholders of the cooperative are, in essence, the owners of the cooperative in a similar fashion to shareholders of any corporation. Thus, it is not an exaggeration to state that cooperators are simultaneously landlords and tenants. A cooperative apartment complex is managed by a board of directors. Those directors are residents of the cooperative and are elected by the shareholders. The shareholders choose for themselves those they want to manage the cooperative. In this case, the "landlord" of the cooperative is the board of directors, who are cooperators as well.

In a standard rental agreement, a renter is obligated to pay rent for the use and occupancy of a particular suite. A cooperator's use and occupancy of a particular apartment derives not from rent payments, but from the purchase of the shares of stock and receipt of the proprietary lease. Cooperators do pay monthly fees. However, those fees cover a cooperator's proportionate share of the building's maintenance expenses, as well as a share of the monthly mortgage payments for the entire building. The

---

[1] For a particularly excellent analysis of the nature and development of the cooperative apartment corporation, see Note, Co-operative Apartment Housing (1948), 61 Harv. L. Rev. 1407.

monthly fee paid by a cooperator is not for the use and occupancy of his or her apartment.

Furthermore, under a standard lease, rent is fixed at a set rate for a specified period of time. While some proprietary leases are for relatively short periods of time, the majority of them are for periods as long as ninety-nine years, and some set no time period at all. The monthly fee, unlike rent, is not fixed in amount. It is variable depending on the particular expenses of the building in any given month. Additionally, once the mortgage on the building is paid off, the burden of making mortgage payments will no longer be upon the cooperators.

There are other distinctions between cooperators and renters as well. Unlike renters, cooperators pay real estate taxes. Their portion of the interest paid on the building's mortgage is tax deductible. If a shareholder sells his or her interest in the cooperative at a profit, such profit can be treated as a long-term capital gain for tax purposes. *Matter of Lacaille (Feldman)* (1964), 44 Misc. 2d 370, 253 N.Y.Supp.2d 937; I.R.C. Section 216 (1983); *id.* at Section 1034(f).

"In sum, the purpose of cooperative housing has been to 'approach individual home ownership as nearly as is possible in a situation where the only practical solution is common operation and management of many features.' It is equally clear that in most cases the cooperator perceives himself as a homeowner." 2 Rohan & Reskin, Real Estate Transactions, Cooperative Housing Law & Practice (1967) 2-12.12, Section 2.01[5], quoting from Lesar, Landlord and Tenant (1957) 200, Section 3.10.

While there are characteristics of a cooperative apartment corporation which resemble those of a standard rental apartment building, there are such significant differences that cooperatives clearly do not fall within the intent and purpose of R.C. Chapter 5321. We therefore hold that the occupancy agreement signed by the parties, as well as all such agreements or proprietary leases utilized in cooperative apartments, are not "rental agreements" as defined in R.C. 5321.01(D). R.C. Chapter 5321 is inapplicable to cooperative apartment corporations.

Because R.C. Chapter 5321 is inapplicable to the occupancy agreement in this case, the trial court erred in ruling that the agreement is unconscionable pursuant to R.C. 5321.14(A). We will now determine, though, as a matter of policy, whether a cooperative corporation can place great limits on the right of a cooperator to alienate his or her property interest in the cooperative.

One of the primary reasons for the development of the cooperative is that it allows its shareholders to choose with whom they want to live. As a private entity, it shares many of the attributes of a private club or organization. In *Penthouse Properties, Inc.* v. *1158 Fifth Avenue, Inc.* (1939), 256 App. Div. 685, 11 N.Y.Supp. 2d 417, the court stated:

"[T]he residential nature of the enterprise, the privilege of selecting neighbors and the needs of the [cooperative] community are not to be ignored. The tenant stockholders in a cooperative apartment are concerned in the purchase of a home. Necessarily, therefore, the permanency of the individual occupants as tenant owners is an essential element in the general plan and their financial responsibility an inducement to the corporation in accepting them as stockholders. Under the 'Plan of Organization' each stockholder is entitled to vote upon the choice of neighbors and their financial responsibility. The latter consideration becomes important when it is remembered that the failure of any tenant to pay his proportion of operating expenses increases the liability of other tenant stockholders. Thus, in a very real sense

the tenant stockholders enter into a relation not unlike a partnership, though expressed in corporate form. Holmes, C.J., in *Barrett* v. *King* (181 Mass. 476, 63 N.E. 934) said of this: 'Furthermore, looking at the stock merely as property, it might be said that, so far as appears and probably in fact, it was called into existence with this restriction inherent in it, by the consent of all concerned. * * * There seems to be no greater objection to retaining the right of choosing one's associates in a corporation than in a firm.'

"* * * The primary interest of every stockholder was in the long term proprietary lease, alienation of which the corporation had the power to restrain. * * *

"From all these considerations it follows that if restraint on alienation of stock may be said to be imposed at all, it is a restraint which in every respect is reasonable and appropriate to the lawful purposes to be obtained." (*Id.* at 691-692.)

Restrictions on the transfer of cooperative corporation stock, as well as the right of a cooperator to sublet, have been repeatedly upheld as:

"[T]he only effective means by which tenants may control occupancy of the apartment, which is of primary interest to tenants who live in close proximity to each other and share common facilities. From the cases examined it appears that this restraint almost always takes the form of prohibiting transfer except with the consent of the board of directors." *Sanders* v. *The Tropicana, supra,* at 281.

In *Wiesner* v. *791 Park Avenue Corp.* (1959), 6 N.Y. 2d 426, 190 N.Y.Supp. 2d 70, 160 N.E. 2d 720, the Court of Appeals of New York held that, in the absence of discrimination based on race, color, or ancestry:

"[T]here is no reason why the owners of the co-operative apartment house could not decide for themselves with whom they wish to share their elevators, their common halls and facilities, their stockholders' meetings, their management problems and responsibilities and their homes." *Id.* at 434. See, also, *68 Beacon Street, Inc.* v. *Sohier* (1935), 289 Mass. 354, 194 N.E. 303.

Undoubtedly, substantial restrictions on the right of a cooperator to transfer his or her interest in the cooperative are necessary to effectuate one of the main purposes and preserve one of the main benefits of the cooperative.

An examination of the occupancy agreement in the instant case does not reveal any restrictive covenants unusual for an agreement of this nature. Paragraphs 9 and 10 of the agreement are, for all intents and purposes, identical in language to Articles 5 and 7 of the occupancy agreement of the Park House, a well known New York City cooperative apartment building. 2A Rohan & Reskin, *supra,* App. D-1, at App. 97-98. See, also, *id.,* App. D-2, at App. 227-228, (occupancy agreement of Jefferson Towers). Additionally, Paragraph 11 of the occupancy agreement relieves the cooperator from the requirement of getting the corporation's consent when a transfer is made to a family member who has acquired the cooperator's share in the corporation. Such a clause is not found in many occupancy agreements or proprietary leases and actually works to the cooperator's benefit.

The occupancy agreement in this case must be viewed within the context of the purposes and goals of a cooperative apartment corporation. When viewed in such a context, the agreement is not, in any fashion, unconscionable. Therefore, the appellant's first assignment of error is well-taken.

## II

We have established that the oc-

cupancy agreement between the parties is lawful and valid. We must now address the issue of whether Sallie Kohler lawfully acquired the right to reside in her brother's town house at Snow Village. Paragraphs 9, 10, and 11 of the occupancy agreement are the relevant paragraphs to this issue and the ones on which we will concentrate our analysis. Paragraph 9 states in relevant part that:

"The resident shareholder shall occupy the dwelling unit allotted to him under this agreement as a private dwelling for himself and his immediate family, and for no other purpose, and may enjoy the use, in common with other Resident Shareholders of the Corporation and occupants of the housing development, of all community property and facilities of the development, so long as he continues to own a qualifying share of the stock of the Corporation, and occupies the dwelling, and abides by the terms of this Agreement."

If Sallie Kohler is an immediate family member of the appellees, and the appellees are still occupants of the unit at Snow Village, then Sallie Kohler is lawfully residing in the town house.

Courts have reached varied results in determining what constitutes an "immediate family" member within the concept of a cooperative. It has been held that a son and daughter-in-law are not a part of a cooperator's immediate family, and it has also been held that a mother-in-law and sister-in-law of a cooperator are members of the immediate family. 2 Rohan & Reskin, *supra,* fn. 23 and 25, Section 7.02[2], at 7-6.5 and 7-6.6; *Matter of Clark* v. *Morris* (1965), 46 Misc.2d 476, 259 N.Y.Supp. 2d 539. However, in the majority of cases in which courts have found that certain persons were immediate family members of a cooperator, those persons had been residing with the cooperator since the beginning of his or her residence in the cooperative apartment. 2 Rohan & Reskin, *supra,* Section 7.02(2), at 7-6.5; *Matter of Clark* v. *Morris, supra,* at 477. In the instant case, Sallie Kohler never lived with her brother and sister-in-law while living at Snow Village. There is no evidence that they considered themselves a single, cohesive immediate family for the purpose of living together. Under such circumstances, the appellant was justified in not considering Sallie Kohler to be a member of the appellees' immediate family.

It is apparent from the record that the appellees no longer occupied the Snow Village town house after they moved into a different home. They removed almost all of their belongings and spent only a few days a year at the town house. Further, their children have spent only one or two days at Snow Village since they moved out. Clearly, the appellees are no longer "occupants" of Unit 56 at Snow Village, under any reasonable definition of the term. Black's Law Dictionary (5 Ed. 1979) 973, defines "occupant" as a:

"Person in possession. Person having possessory rights, who can control what goes on on premises. One who has actual use, possession, or control of a thing."

The appellees do not and cannot control what goes on in Unit 56. They do not have the actual use of the unit; it is Sallie Kohler who controls and uses the town house.

Again, the terms of the occupancy agreement must be viewed within the context of the purposes of the cooperative. A cooperative corporation is composed of a group of persons who choose to live as neighbors and have a strong say as to who can join their community. There is a definite policy against allowing someone to become a shareholder in the cooperative who then moves out and allows someone else, who has not been approved by the corporation, to live in the unit. The nature of the cooperative is such that shareholders are supposed to actually live in their

apartments. This is one of the distinguishing features between a cooperative and a rental. In a rental, the tenants have no say regarding the selection of their neighbors. Under Paragraph 9 of the occupancy agreement, Sallie Kohler is not lawfully residing in Unit 56 at Snow Village.

Paragraph 10 of the agreement states in pertinent part that:

"The Resident Shareholder hereby agrees not to assign this Agreement or sub-let the dwelling unit allotted to him thereunder without the written consent of the Corporation. * * * Any attempted sub-letting or assignment in violation of this provision shall be void."

It is undisputed that the appellees never received the corporation's consent to sublet their unit to Sallie Kohler or sought to have any meeting of the shareholders to effectuate a change in the policy. The appellees were aware of Paragraph 10, disregarded it, and proceeded to allow Sallie Kohler to move into the town house.

As a matter of policy, the appellant does not permit subletting. Although it reserved the right to allow subletting with its written consent no evidence was presented that it was ever allowed. James Kohler was quite cognizant of the corporation's prohibition of subletting due to the fact that he had once been the corporation's president. There is no evidence that during his tenure in that position, the corporation ever allowed a cooperator to sublet. Raymond Miller testified that, in his seven years as an officer of the corporation, he was aware of no circumstances where subletting had been permitted. Such a policy does not mean that the appellant cannot create a mechanism whereby if it so chooses, it can make an exception to the rule and allow a sublet. A rule disallowing subletting and a clause creating an exception to the rule are not incompatible or contradictory. In Sanders v. The Tropicana, supra, at 283-284, the cooperative had permitted subletting on two previous occasions but had disallowed it in the case sub judice. The trial court found such a denial to be arbitrary and capricious. In reversing the trial court, the appellate court stated:

"In our opinion the findings of fact do not support the conclusion that the action of the board of directors in denying consent to the proposed transfer of his stock and proprietary lease by the plaintiff to Pientka in March 1973, was arbitrary and capricious. The cooperative has a social purpose as well as an economic one. The plaintiff purchased his interest in the defendant cooperative with knowledge of the restraint on transfer included in his proprietary lease. The board of directors adopted a policy of limiting apartment occupancy to owners. This decision was reasonably necessary to carry out the cooperative purpose. The board's approval of subletting to at least two non-owners does not render the decision arbitrary and capricious. It would be unreasonable to expect the Board of Directors to have written guidelines detailing every instance in which it will refuse its consent. To so hold would unreasonably restrict the board of directors in the exercise of their authority in the government of the cooperative apartment for the mutual benefit of its tenant-shareholders."

The appellant in the instant case maintains a policy of restricting subletting in order to carry out the purposes of the cooperative and to protect the interests of the cooperators. Therefore, its refusal to consent to the requested sublet by the appellees was valid and reasonable.

Paragraph 11 of the occupancy agreements reads:

"This Agreement is not transferable or assignable except to a member of the Resident Shareholder's immediate family, who shall lawfully acquire his stock in the Corporation and who shall in writing assume this Agreement; or to

a holder of a qualifying share of common stock, who shall have been approved by the Corporation as a stockholder and as a suitable occupant of such dwelling unit, and shall duly have assumed this Agreement in writing. The Resident Shareholder may transfer his right of occupancy under this Agreement to a member of his immediate family by gift, bequest, assignment, or otherwise, provided that such transferee is a holder of a qualifying share of the Corporation's common stock. Any other transfer of this Agreement shall be subject to the requirements of paragraph 10 and paragraph 12 hereof."

It has never been contended that Sallie Kohler acquired the appellees' stock in the cooperative or ever assumed in writing the cooperative occupancy agreement. A family member must be a shareholder of the original cooperator's stock in the cooperative before a transfer, pursuant to Paragraph 11, can be made. If the member of the family is not a shareholder, then it is necessary to receive the consent of the corporation pursuant to Paragraph 10. Paragraph 12 deals with the corporation's option to purchase the cooperator's interest and is irrelevant in the instant case.

Because there has been no compliance with Paragraphs 9, 10, or 11 of the occupancy agreement by the appellees, Sallie Kohler is unlawfully residing in Unit 56 of the Snow Village complex. No legal relationship exists between her and the appellant. The appellant's second assignment of error is with merit.

### III

In its third assignment of error, the appellant challenges the trial court's award of $10 in nominal damages to the appellees due to the appellant's alleged breach of contract. For the reasons already stated herein, the appellant did not breach the occupancy agreement. Therefore, no damages should have been awarded to the appellees. This assignment of error is well-taken.

### IV

In conclusion, we agree with the New York Court of Appeals that the property interest in a cooperative apartment is *sui generis*. Such an interest cannot be analyzed and interpreted within the scope of R.C. Chapter 5321. Further, to legitimately maintain and protect its interests, a cooperative corporation, such as the appellant in the instant case, may place substantial restrictions on the right of an individual cooperator to alienate his or her property interest in the cooperative corporation. The occupancy agreement which we have before us is completely valid and the appellees had knowingly and freely agreed to be bound by its terms.

Because Sallie Kohler is unlawfully residing at the appellees' town house, Unit 56, at the Snow Village complex, the trial court erred in not ruling favorably on the appellant's counterclaim seeking Sallie Kohler's eviction. Accordingly, we hereby reverse the judgment of the trial court and remand this case for proceedings consistent with this opinion.

*Judgment reversed and cause remanded.*

JACKSON and PRYATEL, JJ., concur.